UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRENDAN DUNN, | CASE NO. C18-0257JLR |
| Plaintiff, | ORDER GRANTING MOTION |
| v. | FOR SUMMARY JUDGMENT AND DENYING AS MOOT |
| CITY OF SEATTLE, et al., | MOTION FOR CONTINUANCE |
| Defendants. | |

## I. INTRODUCTION

Before the court are two motions: (1) Defendant City of Seattle's ("the City")

motion for summary judgment (MSJ (Dkt. # 46)); and (2) Plaintiff Brendan Dunn's

motion for a continuance of the trial date, which was presented orally at the October 30,

2019, oral argument on the City's motion for summary judgment (*see* 10/30/19 Hearing

(Dkt. # 62)). The court has considered the motions, the City's submissions in support of

the motion for summary judgment, the argument of the parties, the relevant portion of the

record, and the applicable law. Being fully advised, the court GRANTS the City's

motion for summary judgment and DENIES as moot Mr. Dunn's motion for a continuance.

## II.     BACKGROUND

**A.     The Officer Safety Alert**

This case revolves around a police officer safety alert that was first placed on Mr. Dunn in 2006.  On October 5, 2006, Mr. Dunn was arrested at an anti-war rally in Seattle, Washington, that he attended with two friends.  (*See* Am. Compl. (Dkt. # 3) ¶ 3.1; Esler Decl. (Dkt. # 51) ¶ 22, Ex. 21 at 3 (noting that the "Date of Incident" for Mr. Dunn's arrest was 10/5/2006).[1])  After his arrest, an officer with the Seattle Police Department ("SPD") placed an "officer safety advisory" on Mr. Dunn.  (Am. Compl. ¶ 3.7; Answer (Dkt. # 24) ¶ 3.7.)  The alert said that Mr. Dunn was "potentially dangerous to law enforcement officers" and had been "involved in an assault against a police officer." (Am. Compl. ¶ 3.7.)  It also directed officers not to "arrest or detain [Mr. Dunn] based" on the alert.  (*Id.*)  Mr. Dunn maintains that none of the information in the alert was true and alleges that "it was designed to create a threat to [him] and result in future harassment."  (*Id.* ¶ 3.8.)

SPD originally entered this alert into a Washington State Patrol database, the Washington Crime Information Center ("WACIC"), after Mr. Dunn's arrest in October 2006.  (*See* Am. Compl. ¶ 3.7; Bojang-Jackson Decl. (Dkt. # 48) ¶¶ 2, 5; Noble Decl. (Dkt. # 47) ¶ 17.)  SPD renewed the alert in the WACIC in November 2009.  (*See* Am.

---

[1] Mr. Dunn's complaint mistakenly alleges that this rally took place on November 5, 2006.  (*Compare* Esler Decl. ¶ 22, Ex. 21 at 3 *and id.* ¶ 4, Ex. 3 at 3 *with* Am. Compl. ¶ 3.1.)

Compl. ¶ 3.11; Noble Decl. ¶¶ 16-17.)  The WACIC database "links" with a Federal

Bureau of Investigation database, the National Crime Information Center ("NCIC").

(Bojang-Jackson Decl. ¶ 3.)  The NCIC is a "national computerized index of criminal

justice information" that is populated by and made available to "federal, state, local, and

foreign justice agencies, as well as authorized courts."  (*Id.*; *see also* Noble Decl. ¶ 11.)

As a result of the link between the WACIC and the NCIC, information entered into the

WACIC "may be automatically entered in NCIC" and, conversely, "a record removed

from WACIC will also then be removed from NCIC."  (Bojang-Jackson Decl. ¶ 3.)  It is

not clear when the WACIC was first linked to the NCIC, but an SPD employee

responsible for managing SPD's entries into the WACIC states that the WACIC and the

NCIC were linked "[a]s of at least 2016, and indeed much earlier."  (*See* Bojang-Jackson

Decl. ¶¶ 2-3.)  Thus, at some point in time prior to 2016, the alert on Mr. Dunn that SPD

entered into the WACIC was made available nationally on the NCIC.  (*See id.* at ¶¶ 3, 5;

Noble Decl. ¶¶ 12-17.)

     In June 2008, Mr. Dunn sued the City and several SPD officers for violating his

First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights.  (*See* Esler Decl. ¶ 9, Ex.

8, ¶ 1.1.)  He alleged that he was falsely arrested, falsely imprisoned, subjected to

excessive force, and maliciously prosecuted for what happened at the protest.  (*See id.*)

The parties settled that case at the end of 2009.  (*See* Esler Decl. ¶ 2, Ex. 1 ("Settlement

Agreement"); *id.* ¶ 3, Ex. 2.)  As part of the settlement, the City agreed to remove the

alert that SPD placed on Mr. Dunn.  (*See* Settlement Agreement at 2.)  The Settlement

Agreement required the City to remove the alert within "15 federal court days."  (*See id.*)

The parties agree that the City failed to timely remove the alert. Mr. Dunn alleges that the City failed to remove the safety alert until 2016, a point that the City concedes. (*See* Am. Compl. ¶ 3.12; Answer ¶ 3.12; MSJ at 1 ("The City admits that it failed to remove the Alert [by the end of 2009], and instead did so in February 2016.").)

## B.   Post-Settlement Law Enforcement Encounters

Although the settlement agreement required the City to remove the officer safety alert on Mr. Dunn by the end of 2009 (*see* Settlement Agreement at 2), Mr. Dunn continued to have contentious encounters with police officials after that time. In "late spring of 2010" an officer stopped Mr. Dunn in Olympia, Washington for making an incorrect turn. (Dunn Dep. (Dkt. # 59) at 14:14-15:11.) Mr. Dunn stated that the officer asked if he was "ever in a riot in Seattle" and indicated to Mr. Dunn that "[the officer had] read something on his computer which suggested that [there was a police alert out on Mr. Dunn]." (*See id.* at 15:25-16:16.)

In January 2011, officers from the New York Police Department ("NYPD") stopped Mr. Dunn in Brooklyn, New York by. (*See id.* at 25:6-17, 30:20-31:9; Esler Decl. ¶ 4, Ex. 3 at 4-5 (stating that Mr. Dunn was stopped in Brooklyn, New York in January 2011).) Mr. Dunn claimed that the NYPD officers became much more aggressive and confrontational after they ran his driver's license. (Dunn Dep. at 26:13-27:4; 28:1-10; Esler Decl., Ex. 3 at 5.) Although the NYPD officers did not issue a citation to Mr. Dunn, Mr. Dunn contacted his counsel to discuss the NYPD officers' conduct and also spoke with his cousin and his roommate about the stop. (Dunn Dep. at 28:17-24, 30:1-6, 33:15-34:13.)

On July 13, 2013, the Oneida County Sheriff detained Mr. Dunn in New York for "holding a banner outside Oneida County Jail." (Esler Decl. ¶ 4, Ex. 3 at 4; *see also* Dunn Dep. at 35:7-23.[2]) Mr. Dunn alleges that the sheriff "appeared to be pretty concerned and aggressive after running [his] information." (Esler Decl. ¶ 4, Ex. 3 at 4; *see also* Dunn Dep. at 36:20-37:12, 39:16-40:3.) On July 30, 2014, an officer stopped Mr. Dunn for speeding in Rotterdam, New York. (*See id.* at 47:11-48:8; Esler Decl. ¶ 20, Ex. 19.) Mr. Dunn testified that the officer "became much more aggressive" after he ran Mr. Dunn's driver's license. (*See* Dunn Dep. at 47:11-48:25.)

Despite each of these post-settlement incidents, Mr. Dunn's complaint alleges that he did not realize that the City failed to remove the alert until "he began repeatedly getting pulled over in 2015-2016 without cause in [u]pstate New York." (*Id.* ¶ 3.13.) But Mr. Dunn's deposition testimony is inconsistent with this allegation. Mr. Dunn initially testified that he believed that some of these traffic stops escalated because the officer safety alert had not been removed. (*See* Dunn Dep. at 14:20-15:7; 15:25-16:16; 28:5-10, 28:25-29:9.) For example, in response to questions about the 2010 stop in Olympia, Mr. Dunn testified as follows:

> Q:  But that officer in the spring of 2010 told you that there was still an alert out on you?
>
> A: The officer asked me if I was in a riot in Seattle.
>
> Q: And you believed he was asking that because there was still an alert out?

//

[2] Mr. Dunn's recollection during his deposition was that this incident occurred in "2015 in the summer," but his interrogatory responses specifically state that it occurred on July 13, 2013. (*Compare* Esler Decl. ¶, 4, Ex. 3 at 4 *with* Dunn Dep. at 35:7-23.)

A: He made it very aware to me that he read something on his computer which suggested that.

Q: And do you remember what he said that suggested that? Was it just the riot statement?

A: I said I was falsely charged, and the charges were dropped, and I was suing the Seattle Police Department.

Q: But he made it pretty clear, at least you understood at that time, that there was a police alert out on you at that time?

A: Yes.

(*Id.* at 15:25-16:16.)  When asked about the 2011 stop in Brooklyn, Mr. Dunn

doubled-down on his answer that he suspected at the time that the City had not removed

the alert:

Q: So it's fair to say that the only reason you could deduce that [the NYPD officers] would be acting that way [during the January 2011 stop in Brooklyn] would be that when they went back to the car, they saw an officer safety alert?

A: That would be safe to say.  Their demeanor rapidly changed after they ran my driver's license.

. . .

Q: And at least at that time you were pretty certain that the treatment you received from the police [during the January 2011 stop in Brooklyn] was due to the officer safety alert?

A: As I stated earlier, yes.

Q: Just so the record is clear, you understand when I say "officer safety alert," I'm talking about the alert that was the subject of the settlement that led to this lawsuit, correct?

A: Yes, I understand that you're talking about the alert with the false accusations against me.

(*Id.* at 28:5-10, 28:25-29:9.)

After a break in the deposition, however, Mr. Dunn's counsel interrupted the City's questioning and announced that Mr. Dunn wanted to make a clarification in his testimony:

> [Defendant's counsel] Q: Before we took a break we were discussing this incident in New York City.
>
> [Plaintiff's counsel] And I think Mr. Dunn wanted to make a clarification.
>
> [Defendant's counsel] Q: Something you want to say?
>
> A: So I heard you say, you know, as I'm sitting here now today, recalling these events and the incidents, and as I sit here today, and as I piece things together over the last couple years, I now know that these—that the officer safety alert had an impact on these altercations with the police. However, at the time I didn't.
>
> We were just talking about this incident where I was pulled over by the police in Brooklyn. I didn't have any idea that the alert was still on my name. As far as I was concerned at that time, until, you know, we found out with a public records request officially, I didn't—I was under the impression that the police, you know, followed through with the court orders and they removed my name from the database and removed the alert. I just wanted to make that clear.

(*Id.* at 32:8-33:4.)

Later in his deposition, Mr. Dunn stated that a December 2015 stop in Glen, New York, where a New York State Police officer stopped Mr. Dunn for expired registration, was the first time that Mr. Dunn had serious concerns that the alert was still in place. (*Id.* at 41:11-42:24.) Mr. Dunn noted that, during that stop, the officer "seemed much more concerned" after running Mr. Dunn's license and asked Mr. Dunn whether he had ever lived in Washington State. (*Id.* at 41:21-42:24.) Mr. Dunn testified that when he asked the officer why that was relevant and whether anything came up about Washington State, the officer told him that he should "look into it." (*See id.*) Although Mr. Dunn

acknowledged that he "didn't have the hard evidence yet" that the alert was still active at the time of that stop, he stated that that 2015 stop was when he "started to think" that the alert was still in place.[3] (*See id.* at 45:13-46:2; *see also id.* at 47:5-12 (Q: "Is it fair to say that during that drive with your friend [after the December 2015 stop in New York] you started thinking that maybe there was still an officer safety alert out?" A: "During that drive things became much more clear that that was a high possibility.").)

Mr. Dunn's run-ins with law enforcement after the settlement agreement were not limited to domestic traffic stops. On October 29, 2010, Mr. Dunn was arrested in Utica, New York for public disturbance after he called former President Bill Clinton a war criminal at a public event. (Dunn Dep. at 18:1-19:8; Esler Decl. ¶ 16, Ex. 15 at 3-7.) On August 16, 2016, Mr. Dunn was stopped and detained at the Canadian border while trying to enter the United States. (Esler Decl. ¶ 3, Ex. 3 at 4.) Mr. Dunn testified that the border officials who questioned him "seemed concerned" after they looked at his passport. (Dunn Dep. at 56:20-57:7.) On July 3, 2018, Mr. Dunn was held for nearly two hours at the Canadian border, this time by Canadian immigration officials while Mr. Dunn was attempting to enter Canada. (*See* Esler Decl. ¶ 21, Ex. 20.) During this incident, the immigration officials holding Mr. Dunn asked him "specifically about Seattle" and whether he was "arrested in Seattle." (*See id.* at 2.) Mr. Dunn was eventually allowed to enter Canada after the family members Mr. Dunn was attempting to //

---

[3] This portion of Mr. Dunn's testimony aligns with the allegations in Mr. Dunn's complaint. (*See* Am. Compl. ¶¶ 3.13-3.14.)

visit arrived at the border to ask why the immigration officers would not let Mr. Dunn enter Canada. (*See id.* at 2-3.)

## C. The Current Lawsuit and the City's Motion for Summary Judgment

Because the parties agree that the City did not remove the alert until February 2016, the issues remaining in this case center on the question of what relief, if any, is available to Mr. Dunn as a result of the City's failure to timely remove the alert. Mr. Dunn recently clarified that he is alleging that the City's failure to remove the alert either resulted in or escalated three of his encounters with law enforcement: (1) the July 30, 2014, traffic stop in Rotterdam, New York; (2) the December 30, 2015, traffic stop in Glen, New York; and (3) the July 3, 2018, temporary holding at the Canadian border. (*See* 8/19/19 Tr. (Dkt. # 45) at 5:21-6:12; *see also* Esler Decl. ¶ 4, Ex. 3, at 4.) Based on the harms that allegedly resulted from these three incidents, Mr. Dunn brings claims for federal constitutional violations pursuant to 42 U.S.C. § 1983 (Am. Compl. ¶¶ 5.1-5.10); for violations of his rights under the Washington Constitution (*id.* ¶¶ 5.11-5.14); for negligence (*id.* ¶¶ 5.17-5.19); and for intentional infliction of emotional distress (*id.* ¶¶ 5.20-5.[30]).[4]

The City filed its motion for summary judgment on September 4, 2019. (*See generally* MSJ.) In that motion, the City raises four arguments: (1) Mr. Dunn's claims are barred by the applicable statutes of limitations; (2) Mr. Dunn has no viable claims

//

---

[4] Mr. Dunn asserts claims for "outrage/intentional infliction of emotional distress." (Am. Compl. ¶¶ 5.20-5.[30].) But "'[o]utrage' and 'intentional infliction of emotional distress' are synonyms for the same tort." *Kloepfel v. Bokor*, 66 P.3d 630, 631 n.1 (Wash. 2003).

under 42 U.S.C. § 1983; (3) Mr. Dunn has no viable state law claims; and (4) Mr. Dunn cannot establish that the City caused his alleged damages. (*See generally id.*)

On September 29, 2019, six days after Mr. Dunn's deadline to respond to the City's motion for summary judgment, Mr. Dunn asked the court for a two-week extension of that deadline. (*See* 9/29/19 Mot. (Dkt. # 54) at 3.) Mr. Dunn's counsel, Lawrence Hildes, notified the court that he missed the deadline to file a response to the City's motion due to his wife's medical complications. (*See id.* at 1-3.) By the court's count, that request was the sixth time in this litigation that Mr. Hildes had raised either his or his wife's medical issues as reasons for delay in this case. (*See* 10/16/19 Order (Dkt. # 58) at 2-5 (detailing the history of Mr. Hildes's objections to court deadlines on account of alleged medical issues).) Because the court previously granted Mr. Hildes numerous extensions and repeatedly warned him that he needed to comply with the court's deadlines or withdraw from representing Mr. Dunn, the court denied Mr. Dunn's untimely motion for relief from the summary judgment response deadline. (*See* 9/30/19 Order.) Although the court did not excuse Mr. Hildes's failure to adhere to the deadline to oppose the City's motion for summary judgment, the court granted oral argument and both parties submitted oral argument on the City's motion for summary judgment. (*See* 10/16/19 Order; 10/30/19 Hearing.) Indeed, Mr. Hildes repeatedly assured the court that, despite his wife's illness, he was able to prepare to argue and was prepared to argue the City's motion at the October 30, 2019, hearing. (*See* 10/30/19 Hearing.)

//

//

**D.     Mr. Dunn's Motion for Continuance**

At the October 30, 2019, hearing on the City's motion for summary judgment, Mr. Hildes orally moved for a continuance of the trial date and remaining pretrial deadlines. (*See* 10/30/19 Hearing.)  Mr. Hildes explained that he needed a continuance due to his wife's ongoing medical issues.  (*See id.*)  Mr. Hildes assured the court, however, that he was prepared to argue the City's motion for summary judgment.  (*See id.*)  Thus, the court informed Mr. Hildes that it would take his oral motion for a continuance under advisement and proceeded to hear argument from the parties on the City's motion for summary judgment.  (*See id.*)

## III.     ANALYSIS

**A.     Standard**

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S.

at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of an issue of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party will bear the ultimate burden of persuasion at trial, it must establish a *prima facie* showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id*. at 1473. "Even when a motion for summary judgment is unopposed, . . . the moving party retains its burden to demonstrate the absence of any material issue of fact." *Lopez-Gomez v. Sessions*, 693 Fed. App'x 729, 731 (9th Cir. 2017) (citing *Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 (9th Cir. 1994)). Trial courts resolving unopposed summary judgment motions have an obligation to evaluate independently the sufficiency of the moving papers. *See Cristobal*, 26 F.3d at 1496.

**B.     Mr. Dunn's Claims Under the Washington Constitution**

The City alleges that summary judgment is warranted against Mr. Dunn's claim that the City's actions and inactions violate the Washington Constitution (*see* Am. Compl. ¶¶ 5.11-5.14) because there is no private right of action for damages under the Washington Constitution. (*See* MSJ at 21.) At oral argument, Mr. Dunn conceded that point. (*See* 10/30/19 Hearing.) The court agrees. Washington law has no counterpart to 42 U.S.C. § 1983, *see Rustlewood Ass'n v. Mason Cty.*, 981 P.2d 7, 14 n.10 (Wash. Ct.

App. 1999), and Washington courts have rejected attempts to create a private right of

action for damages under the Washington Constitution absent guidance from the

legislature, *see Reid v. Pierce Cnty.*, 961 P.2d 333, 342-43 (1998); *see also Blinka v.*

*Wash. State Bar Ass'n*, 36 P.3d 1094, 1102 (Wash. Ct. App. 2001). Thus, the City is

entitled to judgment as a matter of law against this claim. *See, e.g.*, *Shippey v. Lovick*,

No. C12-225RAJ, 2013 WL 1124073, at *2 (W.D. Wash. Mar. 18, 2013) ("[T]he court

will not address Mr. Shippey's attempts to inject the Washington Constitution into this

dispute, because unlike violations of the United States Constitution, which are remediable

via § 1983, there is no cause of action for damages arising from violations of the

Washington Constitution." (citing *Reid*, 961 P.2d at 342-43)).

**C.    Statute of Limitations**

        1.    Applicable Limitations Period

        The City also claims that Mr. Dunn's remaining state and federal causes of action

are barred by the applicable statutes of limitations. (*See* MSJ at 1-2, 14-16.) Because 42

U.S.C. § 1983 does not contain a statute of limitations, the court applies Washington's

statute of limitations for personal injury actions and Washington's law on equitable

tolling to Mr. Dunn's Section 1983 claims. *See Butler v. Nat'l Cmty. Renaissance of*

*Cal.*, 766 F.3d 1191, 1198 (9th Cir. 2014) ("Section 1983 does not contain its own statute

of limitations. Without a federal limitations period, the federal courts 'apply the forum

state's statute of limitations for personal injury actions, along with the forum state's law

regarding tolling, including equitable tolling, except to the extent any of these laws is

inconsistent with federal law.'" (quoting *Canatella v. Van De Kamp*, 486 F.3d 1128,

1132 (9th Cir. 2007)). The limitations period for personal injury actions in Washington is three years. *See* RCW 4.16.080(2). Thus, the limitations period for Mr. Dunn's Section 1983 claims is three years. *See id.*; *Rose v. Rinaldi*, 654 F.2d 546, 547 (9th Cir. 1991).

Three years is also the applicable limitations period for Mr. Dunn's negligence and intentional infliction of emotional distress claims. *See* RCW 4.16.080(2); *see also Woods View II, LLC v. Kitsap Cty.*, 352 P.3d 807, 816 (Wash. Ct. App. 2015) (negligence); *Cox v. Oasis Physical Therapy, PLLC*, 222 P.3d 119, 127 (Wash. Ct. App. 2009) (intentional infliction of emotional distress). However, Washington has what the Ninth Circuit has recently referred to as a "special statute of limitations" for tort claims against local government entities. *See* RCW 4.96.020(4); *Boston v. Kitsap Cty.*, 852 F.3d 1182, 1185-88 (9th Cir. 2017) (discussing whether RCW 4.96.020(4) is a "special statute of limitations" or a "tolling provision"). RCW 4.96.020(4) requires parties to present tort claims against local government entities to the entity and then wait 60 days before filing suit. RCW 4.96.020(4). That statute also states that "[t]he applicable period of limitations within which an action must be commenced shall be tolled during the sixty calendar day period." *Id.*; *see also Castro v. Stanwood Sch. Dist. No. 401*, 86 P.3d 1166, 1168 (Wash. 2004) ("Under RCW 4.96.020(4), the tolling provision temporarily stops, but then resumes, the period of time within which the plaintiff must file a lawsuit against a local governmental entity. Essentially, the provision adds 60 days to the end of the otherwise applicable statute of limitations."). Mr. Dunn filed a notice of claim with the City on July 19, 2016. (*See* Esler Decl. ¶ 24, Ex. 23.) Thus, under RCW 4.96.020(4), Mr. Dunn is entitled to an additional 60 days on top of the three-year limitations period

provided in RCW 4.16.080(2) for his negligence and intentional infliction of emotional distress claims. Because the Ninth Circuit recently held that RCW 4.96.020(4) is inapplicable to Section 1983 claims, however, *see Boston*, 852 F.3d at 1184, 1189, Mr. Dunn's Section 1983 claims are subject only to the three-year period in RCW 4.16.080(2).[5]

Mr. Dunn filed this action on February 19, 2018. (*See* Compl. (Dkt. # 1).) Thus, under RCW 4.16.080(2), Mr. Dunn's Section 1983 causes of action are time-barred if they accrued prior to February 19, 2015. Because Mr. Dunn is entitled to an additional 60 days on his negligence and intentional infliction of emotional distress claims under RCW 4.96.020(4), those claims are time-barred if they accrued prior to December 21, 2014. Because the statute of limitations is an affirmative defense, the City bears the burden on its statute of limitations argument. *See Payan v. Aramark Mgmt. Servs. Ltd. P'ship*, 495 F.3d 1119, 1122 (9th Cir. 2007) ("[B]ecause the statute of limitations is an affirmative defense, the defendant bears the burden of proving that the plaintiff filed beyond the limitations period." (citations omitted)); *Precision Airmotive Corp. v. Rivera*, 288 F. Supp. 2d 1151, 1153 (W.D. Wash. 2003) ("Under Washington law, where a defendant moves for summary judgment on the basis of an affirmative defense such as the appropriate statute of limitations, the defendant bears the initial burden of proving the absence of an issue of material fact as to that defense." (citations omitted)). The issue,

//

_____

[5] At oral argument, the parties agreed that Mr. Dunn's Section 1983 claims are subject to the three-year limitations period under RCW 4.16.080(2) and that Mr. Dunn is entitled to an additional 60 days under RCW 4.96.020(4) for his state law claims. (*See* 10/30/19 Hearing.)

1   then, is whether the City has carried its burden to show that there is no material dispute of

2   fact that Mr. Dunn's Section 1983 claims accrued prior to February 19, 2015, and that his

3   state law claims accrued prior to December 21, 2014.

4          2.   <u>Accrual Date for Mr. Dunn's Claims</u>

5         The City's statute of limitations argument turns on the accrual date for Mr. Dunn's

6   claims. For purposes of determining when Mr. Dunn's causes of action accrued, federal

7   law governs the accrual date for his Section 1983 claims, while state law governs the

8   accrual date for his state law claims. *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758,

9   760 (9th Cir. 1991) ("Federal law determines when a cause of action accrues and the

10   statute of limitations begins to run for a § 1983 claim." (citation omitted)); *Norco Const.,*

11   *Inc. v. King Cty.*, 801 F.2d 1143, 1145 (9th Cir. 1986) ("State law . . . determines when

12   the statute of limitations begins to run on state claims."). For Mr. Dunn's causes of

13   action, there is no meaningful difference between state and federal accrual law. "Under

14   federal law, a claim accrues when the plaintiff knows or has reason to know of the injury

15   which is the basis of the action." *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999)

16   (citations omitted). "Under Washington law, the general rule for personal injury actions

17   is that "a cause of action accrues at the time the act or omission occurs."[6] *Matter of*

18   *//*

---

19

20        [6] The City's effort to cast Mr. Dunn's causes of action as breach of contract claims for purposes of accrual is confusing. (*See, e.g.*, MSJ at 14-15.) The City recognizes that "Mr. Dunn has not pleaded any breach of contract claim." (*Id.* at 2 n.1.) Instead, he alleges state tort claims and federal constitutional claims. (*See* Am. Compl. ¶¶ 5.1-5.[30].) Because Mr. Dunn has no contract claim, state law on the accrual period for breach of contract actions is irrelevant—as is the City's apparent belief that Mr. Dunn's "real claim" is one for breach of contract. (*See* MSJ at 15.)

*Estates of Hibbard*, 826 P.2d 690, 694 (Wash. 1992) (citation omitted). However, Washington courts apply a discovery rule under which "a cause of action does not accrue until a party knew or should have known the essential elements of the cause of action—duty, breach, causation, and damages." *Green v. A.P.C. (Am. Pharm. Co.)*, 960 P.2d 912, 915 (Wash. 1998) (citations omitted). Washington's focus on the elements of a cause of action "does not mean that the action accrues when the plaintiff learns that he or she has a legal cause of action; rather, the action accrues when the plaintiff discovers the salient facts underlying the elements of the cause of action." *1000 Virginia Ltd. P'ship v. Vertecs Corp.*, 146 P.3d 423, 428 (Wash. 2006); *see also Lee v. United States*, 809 F.2d 1406, 1410 (9th Cir. 1987) ("A claim accrues as soon as a potential claimant either is aware or should be aware of the existence of and source of his injury, not when he knows or should know that the injury constitutes a legal wrong.").

Due to the unique nature of Mr. Dunn's claims, it is important to distinguish between the injury that gives rise to his causes of action and the effects of that injury in order to determine when Mr. Dunn's claims accrued. Each of Mr. Dunn's causes of action arise out of a singular wrongful act by the City—the failure to remove the alert in late 2009. (*See* Am. Compl. ¶ 3.12.) That is his alleged injury. The City was supposed to remove the alert, but did not do so, which gave rise to Mr. Dunn's causes of action under Section 1983 and his state law tort claims. (*See id.* ¶¶ 4.1-4.5, 5.1-5.[30].) As a result of that wrongful act by the city, Mr. Dunn alleges that he was targeted by law enforcement and received increased and unwanted attention from law enforcement. (*See id.* at ¶¶ 3.13-3.14, 3.22-2.23.) But, as Mr. Dunn's counsel recently confirmed, this

increased and unwanted attention from law enforcement officials is not the source of Mr.

Dunn's injury or his causes of action against the City; it is an effect of the injury he

suffered when the City failed to remove his alert:

> [The court:] And am I correct that it is not what happened during those incidents—you are not alleging that the police brutalized him or whatever else—all you're saying is that he was pulled over in the first place because of this alert?

> [Plaintiff's counsel:] He was pulled over in the first place, he was held much longer than he would have been, he was held in a way that was more threatening, and he was told that there was this officer-safety alert about him out of Washington State and that he needed to deal with it because it was going to keep coming up.

> So there was—so—yeah. So there's nothing—that's the facts from the stops.

> And then the border interrogation was very specifically about that arrest in '06 and went on for hours because of it.

(8/19/19 Tr. at 7:12-25.)

This distinction between Mr. Dunn's injury and the continuing effects of that

injury is key. As noted above, Mr. Dunn's claims accrued when he knew or should have

known about "the injury which is the basis of the action," *TwoRivers*, 174 F.3d at 991, or,

stated otherwise, about "the salient facts underlying the elements of the cause of action,"

*1000 Virginia Ltd. P'ship*, 146 P.3d at 428. If Mr. Dunn had alleged that his injury

resulted from the conduct of the law enforcement officials who pulled him over or

detained him at the border, then his causes of action would not have accrued until those

incidents took place. But, because Mr. Dunn's grievance rests on the City's failure to

remove the alert, the court concludes that his causes of action accrued at the time that he

knew or should have known that the alert remained active.

On this point, *Knox v. Davis* lends an apt analogy. 260 F.3d 1009 (9th Cir. 2001).

In *Knox*, the plaintiff was an attorney who brought a Section 1983 action based on

California corrections facilities' revocation of her legal visitation and mail privileges.

*See id.* at 1011-12. The Ninth Circuit held that the plaintiff's cause of action accrued

when the Deputy Director of the corrections facilities sent the plaintiff a letter

permanently revoking her visitation and mail rights, which resulted in her claims being

time-barred. *See id.* at 1013. In an attempt to get around that result, the plaintiff likened

her situation to "being punched in the nose, arguing that the January 20, 1996 permanent

suspension letter acted as the first punch and each subsequent denial of access to clients

housed in [the corrections] facilities acted as additional punches" that "trigger[ed] a new

running of the statute of limitations from the point she was last punched." *Id.* at 1014.

The court rejected that analogy due to the fact that the plaintiff "explicitly allege[d] that

each visitation or correspondence denial was based upon the permanent suspension

decision." *Id.* In other words, while the court accepted the plaintiff's premise that the

letter "served as the symbolic punch in the nose, triggering the statute of limitations," the

subsequent denials of the plaintiff's access to her clients did not reset or alter the accrual

date because those denials were "more akin to developing problems as a natural

consequence of the one and only punch, such as a bloody nose." *Id.* at 1014-15.[7]

//

---

[7] Washington law also recognizes the importance of this distinction between wrongful conduct and the harm that flows from that conduct. *See Green*, 960 P.2d at 916 ("The statute of limitations is not postponed by the fact that further, more serious harm may flow from the wrongful conduct.").

Here, to borrow the analogy from *Knox*, the City symbolically punched Mr. Dunn in the nose when it failed to remove the alert in late 2009. Like the plaintiff in *Knox*, Mr. Dunn has "explicitly alleged" that his causes of action are based on that failure to remove the alert. (*See* 8/19/19 Tr. at 7:12-25); *Knox* 260 F.3d at 1014. The increased scrutiny from law enforcement officials that Mr. Dunn alleges he suffered due to the alert remaining active are "bloody nose[s]" that do not reset the accrual date of his claims or trigger a new limitations period. *See Knox*, 260 F.3d at 1014-15. Thus, under Washington and federal law, the limitations period on Mr. Dunn's claim began to run when Mr. Dunn knew or should have known that the City failed to remove the alert.

As noted above, Mr. Dunn's deposition testimony is contradictory on the topic of when he first knew that the City had failed to remove the alert. (*Compare* Dunn Dep. at 15:25-16:16, 28:5-10, 28:25-29:9 *with id.* at 32:8-33:4.) At the beginning of Mr. Dunn's deposition, he unequivocally testified that, at the time of the 2010 traffic stop in Olympia and the 2011 traffic stop in Brooklyn, he believed that the alert was still active. (*See, e.g.*, Dunn Dep. at 16:13-16 (Q: "But [the officer in Olympia] made it pretty clear, at least you understood at that time, that there was a police alert out on you at that time?" A: "Yes."), 28:25-29:3 (Q: "And at least at that time [shortly after the 2011 stop in Brooklyn] you were pretty certain that the treatment you received from the police was due to the officer safety alert?" A: "As I said earlier, yes.").) Because these stops occurred in 2010 and 2011—between 7-8 years before Mr. Dunn filed this lawsuit—the City argues that this testimony demonstrates that Mr. Dunn's claims are time-barred. (*See* MSJ at 14-16.)

After a break in the deposition, however, Mr. Dunn's counsel interrupted the City's questioning and announced that Mr. Dunn wanted to make a clarification. (*See id.* at 32:8-33:4.) Mr. Dunn then noted that, although he "now know[s]" that the alert impacted the traffic stops in 2010 and 2011, "at the time [of the stops] he didn't [know]." (*See id.*) Instead, he claimed that he did not know for certain that the alert was still active until he "found out with a public records request officially." (*See id.*) For purposes of summary judgment, the court does not need to wade into this conflicting testimony. The standard for accrual of a cause of action under Washington and federal law asks when Mr. Dunn "knew or should have known" that the alert was still active. *See TwoRivers*, 174 F.3d at 991; *Green*, 960 P.2d at 915. Thus, even if the court credits Mr. Dunn's testimony that he did not know for certain that the alert was active until his counsel filed a public records request, that does not foreclose the possibility that he should have known earlier.

Under the "knew or should have known" standard, Washington and federal courts hold that "[t]he plaintiff must be diligent in discovering the critical facts." *Bibeau v. Pac. Nw. Research Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999); *Green*, 960 P.2d at 916 ("The general rule in Washington is that when a plaintiff is placed on notice by some appreciable harm occasioned by another's wrongful conduct, the plaintiff must make further diligent inquiry to ascertain the scope of the actual harm."). This diligence requirement dooms Mr. Dunn's claims. Regardless of what Mr. Dunn states he knew at the time of his traffic stops, there are a handful of undisputed facts that arose during those stops that would have put a diligent person on notice that the alert remained active. First,

during the spring 2010 stop in Olympia based on an alleged incorrect turn, the officer

asked Mr. Dunn if he was "ever in a riot in Seattle" and indicated that there was

something suspicious about Mr. Dunn "on [the officer's] computer." (*See* Dunn Dep. at

14:14-15:11, 15:25-16:16.)  Second, when Mr. Dunn was stopped because he "looked

like he was lost" in Brooklyn in January 2011 (*see id.* at 25:12-20), the officers "swore

at" Mr. Dunn, "threatened" him, and "created an environment which made [him] feel

very concerned for [his] safety" after they ran Mr. Dunn's driver's license (*id.* at 28:1-10;

*see also* Esler Decl. ¶ 4, Ex. 3 at 5).  In July 2013, when the Oneida County Sheriff

detained Mr. Dunn for "holding a banner outside Oneida County Jail," the sheriff

"appeared to be pretty concerned and aggressive after running [Mr. Dunn's]

information."  (Esler Decl. ¶ 4, Ex. 3 at 4; *see also* Dunn Dep. at 36:20-37:12, 39:16-

40:3.)  During the July 30, 2014, stop in Rotterdam, New York for speeding, the officer

"became much more aggressive" after he ran Mr. Dunn's driver's license.  (*See* Dunn

Dep. at 47:11-48:25; Esler Decl. ¶ 20, Ex. 19.)

   As these incidents show, Mr. Dunn was repeatedly pulled over or detained by law

enforcement officials for relatively minor offenses, only to have those law enforcement

officials become increasingly hostile toward him after running his driver's license.  Mr.

Dunn acknowledged as much during his deposition:  "I can say that there's been a pattern

over the years of me getting pulled over or detained and only after looking at my driver's

license, you know, the aggression starting or amplifying."  (Dunn Dep. at 38:15-21.)

That pattern of practice by different law enforcement officials in different jurisdictions—

all of which occurred outside the limitations periods—should have keyed Mr. Dunn into

the possibility that the City had not removed the alert. This is especially true given that the Olympia police officer who stopped Mr. Dunn for an incorrect turn specifically referenced the Seattle protest that resulted in entry of the alert entered against Mr. Dunn. (*See* Dunn Dep. at 15:3-7, 15:25-16:3.) And, even though the discovery rule does not "toll the statute of limitations until a party walks into a lawyer's office and is specifically advised that he or she has a legal cause of action," *Green*, 960 P.2d at 915 (citations omitted); *see also Lee*, 809 F.2d at 1410, Mr. Dunn did contact his lawyer regarding the 2011 stop in Brooklyn (*see* Dunn Dep. at 28:17-29:9). This is another factor the court can consider in determining whether Mr. Dunn should have known that the alert was still in place. *Cf. Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1061 (9th Cir. 2012) (considering a corporation's meeting with its general counsel as evidence that the corporation had constructive or actual notice of its claims); *Stuart v. Coldwell Banker Commercial Grp., Inc.*, 745 P.2d 1284, 1289 (Wash. 1987) (considering a board of director's decision to consult a lawyer as evidence that the board "knew or reasonably should have known" about its claims).

Thus, the court concludes that there is no genuine dispute of material fact that Mr. Dunn's causes of action accrued by at least the July 30, 2014, stop in Rotterdam.[8] By that time—after Mr. Dunn had been treated aggressively by law enforcement officials who had run his driver's license on at least four separate occasions—Mr. Dunn was

//

---

[8] Because any accrual date before December 21, 2014, results in each of Mr. Dunn's remaining causes of action being time-barred, *see supra* § III.B.1, the court does not need to determine whether Mr. Dunn's causes of action accrued before the July 30, 2014, stop.

aware of sufficient facts suggesting that the City failed to remove the alert. *See Green*, 960 P.2d at 916 ("[O]ne who has notice of facts sufficient to put him upon inquiry is deemed to have notice of all acts which reasonable inquiry would disclose." (citations omitted)). Had Mr. Dunn been diligent based on what he knew by at least July 30, 2014, he would have discovered—as he did after the December 2015 stop in New York—that the alert remained active. Because he was not diligent, however, his claims accrued outside the limitations period. *See O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1147 (9th Cir. 2002) ("Because the plaintiff must be diligent in discovering the critical facts[,] a plaintiff who did not actually know of his claim will be barred if he should have known of it in the exercise of due diligence."); *Green*, 960 P.2d at 916.

3.  Applicability of Tolling Doctrines

Neither Washington's equitable tolling doctrine nor the doctrine of continuing torts saves Mr. Dunn's causes of action from being time-barred. Under Washington law, "[t]he predicates for equitable tolling are bad faith, deception, or false assurances by the defendant and the exercise of diligence by the plaintiff."[9] *Millay v. Cam*, 955 P.2d 791, 797 (Wash. 1998) (citations omitted). "[T]he doctrine of equitable tolling is a narrow doctrine to be used only sparingly . . . ." *In re Haghighi*, 309 P.3d 459, 465 (Wash. 2013). Although the City acknowledges its mistake in failing to timely remove the alert, there is no evidence suggesting that the City acted in bad faith, attempted to deceive Mr.

//

---

[9] As noted above, Washington's tolling law applies to Mr. Dunn's Section 1983 claims. *See Butler*, 766 F.3d at 1198.

Dunn, or provided him with false assurances.  To the contrary, the record shows that shortly after Mr. Dunn drew the City's attention to the alert's continued existence, the City had it permanently removed.  (*See* Esler Decl. ¶ 22, Ex. 21 at 2-3; Bojang-Jackson Decl. ¶¶5-6.)  Thus, equitable tolling is not warranted in this case.

The "continuing tort" or "continuing violation" doctrine is similarly unavailable to Mr. Dunn.  Where it applies, the doctrine of continuing violations holds that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period."[10]  *Bird v. Dep't of Human Servs.*, 935 F.3d 738, 746 (9th Cir. 2019); *see also Pac. Sound Res. v. Burlington N. Santa Fe Ry. Corp.*, 125 P.3d 981, 989 (Wash. Ct. App. 2005).  But that doctrine does not apply here.  First, no Washington court has applied the continuing tort doctrine outside of property claims and employment discrimination claims.  *See, e.g.*, *Antonius v. King Cty.*, 103 P.3d 729 (Wash. 2004) (employment discrimination); *Pac. Sound Res.*, 125 P.3d at 981 (nuisance, trespass).  In fact, Washington courts have expressly declined to extend the continuing tort doctrine beyond these contexts.  *Cox v. Oasis Physical Therapy, PLLC*, 222 P.3d 119, 126-27 (Wash. Ct. App. 2009) ("Ms. Cox has not shown the continuing violation doctrine applies to negligence claims, as opposed

//

---

[10] The Ninth Circuit has recently clarified that "the term 'continuing violation' is 'something of a misnomer,' in that it 'implies that there is but one incessant violation and that the plaintiffs should be able to recover for the entire duration of the violation, without regard to the fact that it began outside the statute of limitations window.'  But that is not the scenario that it describes.  Rather than 'one on-going violation,' a continuing violation is really 'a series of repeated violations.'"  *Flynt v. Shimazu*, __ F.3d __, No. 17-17318, 2019 WL 4925771, at *4 n.3 (9th Cir. Oct. 7, 2019) (quoting *Knight v. Columbus*, 19 F.3d 579, 582 (11th Cir. 1994)).

to discrimination claims.  We decline to extend this doctrine beyond discrimination claims.").

Second, although the Ninth Circuit holds that Section 1983 claims are subject to the continuing violation doctrine, *see Bird*, 935 F.3d at 746, "[a] continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation," *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981).  The court has already drawn the distinction between the sole wrongful act at issue in this case—the City's failure to remove the alert—and the continuing effects of that wrongful act.  *See supra* § III.C.2.  Because there is only one wrongful act in this case, there can be no "continuing violation" that serves to toll or otherwise extend the discovery period.

In sum, the court concludes that the City has carried its burden to show that there is no genuine dispute of material fact that Mr. Dunn's Section 1983 claims and his claims for negligence and intentional infliction of emotional distress accrued by July 30, 2014, at the latest.  Thus, because Mr. Dunn did not file this lawsuit until February 18, 2018, Mr. Dunn's Section 1983 claims are time-barred by the three-year statute of limitations in RCW 4.16.080(2) and his state law claims are time-barred by the three-year plus 60-day limitations period under RCW 4.16.080(2) and RCW 4.96.020(4), meaning that the City is entitled to judgment as a matter of law.  The court therefore GRANTS the City's motion for summary judgment and DISMISSES this action with prejudice.[11]  Because the

//

---

[11] Because the court determined that there is no private right of action under the Washington Constitution and that Mr. Dunn's remaining claims are time-barred, the court will not address the alternative grounds for summary judgment presented in the City's motion.

court grants summary judgment in favor of the City, the court also DENIES as moot Mr.

Dunn's oral motion for a continuance of the trial date and other pretrial deadlines.

## IV.    CONCLUSION

For the reasons set forth above, the court GRANTS the City's motion for summary

judgment (Dkt. # 46), DENIES as moot Mr. Dunn's oral motion for a continuance (*see*

10/30/19 Hearing), and DISMISSES this action with prejudice.

Dated this 31st day of October, 2019.

JAMES L. ROBART
United States District Judge